# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | P. Michael Mahoney | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 50099 | **DATE** | 4/10/2003 |
| **CASE TITLE** | | Allen vs. Barnhart | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons stated on the attached memorandum opinion and order, Plaintiff's Motion for Summary Judgment is granted. The case is remanded for determination of Plaintiff's seizure disorder and possible multiple sclerosis under Listing 11.00. It is further ordered that Defendant's Motion for Summary Judgment is denied.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | | **Document Number** |
|---|---|---|---|---|---|
| | No notices required. | | number of notices | | |
| ✓ | Notices mailed by judge's staff. | | APR 10 2003 | | |
| | Notified counsel by telephone. | | date docketed | | 16 |
| | Docketing to mail notices. | | | | |
| | Mail AO 450 form. | | 4/9/2003 | | |
| | Copy to judge/magistrate judge. | | date mailed notice | | |
| sp | courtroom deputy's initials | | sp | | |
| | | Date/time received in central Clerk's Office | mailing deputy's initials | | |

CLERK
U.S. DISTRICT COURT

03 APR 10 PM 1:46

FILED-WD

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### WESTERN DIVISION

| | | |
|---|---|---|
| SHANNON C. ALLEN, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 02 C 50099 |
| | ) | |
| v. | ) | Magistrate Judge |
| | ) | P. Michael Mahoney |
| JO ANNE B. BARNHART, | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Shannon C. Allen, ("Plaintiff"), seeks judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner"). *See* 42 U.S.C. §§ 405(g), 1383(c)(3). The Commissioner's final decision denied Plaintiff's application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") pursuant to Title XVI of the Social Security Act (the "Act"). 42 U.S.C. §1381(a). This matter is before the Magistrate Judge pursuant to consents filed by both parties on May 20, 2002  *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.

## I.    BACKGROUND

Plaintiff filed for DIB (Tr. 98) and SSI (Tr. 255) on August 9, 2000, alleging disability on October 13, 1999. (Tr. 98, 255). Plaintiff's application for benefits was denied on January 10, 2001. (Tr. 63). On January 22, 2001, Plaintiff filed a request for reconsideration. (Tr. 67). Plaintiff's request for reconsideration was denied on March 28, 2001. (Tr. 69). Plaintiff then filed a request for a hearing before an Administrative Law Judge ("ALJ") on June 12, 2001. (Tr. 72). Plaintiff appeared, with counsel, before an ALJ on October 4, 2001. (Tr. 19). In a decision dated January 25,

2002, the ALJ found that Plaintiff was not entitled to DIB or SSI. (Tr. 18). On January 28, 2002, Plaintiff requested a review of the ALJ's decision by the Appeals Council. (Tr. 8). On March 1, 2002, the Appeals Council denied Plaintiff's request for review. (Tr. 6).

## II.  FACTS

Plaintiff was born on March 12, 1970 (Tr. 25) and was thirty-one years old at the time of her October 2001 hearing. (Tr. 19). According to her own testimony, Plaintiff graduated from high school in 1989. (Tr. 25). Throughout grade school, middle school, and high school, Plaintiff was enrolled in special education classes. (Tr. 26). Plaintiff stated that, although she can write, her spelling is really bad and she is unable to do math in her head.[1] (Tr. 26). Plaintiff stated she is a slow learner and has processing problems, which is why she was in special education classes. (Tr. 36). At the time of her hearing, Plaintiff, married with no children, was living with her husband. (Tr. 24).

From 1993 to 1999 Plaintiff worked in an assembly plant wherein she did some bench assembly work. (Tr. 27). Plaintiff's job responsibilities included looking at parts used in bench assembly and determining if there were any scratches on those parts, and if there were, separating those parts from the good parts on the assembly line. (Tr. 27). Plaintiff's job at the bench assembly plant required her to occasionally lift twenty pounds. (Tr. 28).

Prior to Plaintiff's job at the bench assembly plant, Plaintiff worked at Taco Bell and at a grocery store. At Taco Bell, Plaintiff cleaned tables and picked up garbage from the tables. (Tr. 28). Generally, Plaintiff had no interaction with customers at Taco Bell. (*Id.*). At the grocery store,

---

[1] Plaintiff testified that if she was in a store and gave the cashier a ten dollar bill that she would not be able to determine the proper change in her head. (Tr. 26).

Plaintiff bagged groceries and assisted in organizing the shopping carts in the parking lot and returning them to the store. (Tr. 29).

Plaintiff suffers from seizures which Plaintiff alleges prevents her from working. Plaintiff testified that when she has a seizure she starts to "shake a little and, and just kind of like right leg goes up in the air and [her] arm goes to the left and [her] head turns cock-eyed and [Plaintiff is] like shaking, but [Plaintiff] can hear what's going on." (Tr. 31). Plaintiff's seizures generally last between a minute to two minutes but sometimes longer. (*Id.*). After five or ten minutes, Plaintiff stated she has to calm herself down and think of good things before she returns to normal. (Tr. 32). Plaintiff suffers from the seizures described above a couple of times during the week. Based on Plaintiff's testimony, it appears that Plaintiff suffers from the seizures mainly at night when she lies down for bed, but on occasion Plaintiff will suffer a seizure during the day. (Tr. 33). Aside from having the physical symptoms described above a couple times a week, Plaintiff stated that at times when she is talking she becomes jittery and her hands begin to shake and she has to calm herself down. (*Id.*). Plaintiff attempts to control her seizures by removing herself from stressful situations and just sitting. (*Id.*).

At the time of her hearing, Plaintiff was taking Dilantin four times daily, even though five times daily was the recommended amount. (Tr. 37). Plaintiff stated because of her financial situation she was only able to take the medication four times daily and that she was always consistent in taking her medication four times daily. (*Id.*). At one time Plaintiff did take her medication five times daily and the additional dosage did make "somewhat" of a difference. (Tr. 38). The biggest difference, Plaintiff stated, was the additional dosage slowed down the frequency of her seizures. (*Id.*).

On a regular day Plaintiff watches t.v. or has friends over to talk. (Tr. 42). Plaintiff's husband does all the housecleaning, aside from folding clothes. (Id.). In fact, based on Plaintiff's testimony, Plaintiff's husband does all the cooking, cleaning, laundry, and grocery shopping. (Tr. 42-43). On occasion Plaintiff goes with her husband to the grocery store but only if he is getting a few items because Plaintiff really cannot stand long on her feet. (Tr. 43).

In addition to her seizure medication, Plaintiff stated she takes medication for arthritis. (Id.). Plaintiff's arthritic pain is generally located in the back of her right calf. (Id.). The pain in her calf usually occurs when Plaintiff is walking or standing for longer than five minutes. (Tr. 44). After five minutes of walking, Plaintiff testified her legs get weak and she has to sit. (Id.). However, after sitting for a while, Plaintiff has a hard time standing because she is unable to gain her balance and needs support to get up. (Id.).

Plaintiff's husband, Jimmy Allen, appeared before the ALJ at Plaintiff's October 2001 hearing. (Tr. 47). Plaintiff's husband testified that he works from seven in the morning to three-thirty in the afternoon Monday through Friday. (Id.). Because of his hours, Plaintiff's husband generally does not see his wife in the morning, because she is sleeping, but rather sees her only when he gets home from work. (Tr. 48). Plaintiff's husband testified that during the night Plaintiff suffers from seizures whereby, when she lays down, Plaintiff goes to the right and her leg goes straight up, and her arm goes another direction and she foams at the mouth. (Tr. 48-49). Aside from the physically apparent seizures, Plaintiff's husband testified that daily he has to remind Plaintiff of things they talked about and recently said and that Plaintiff's appeared to be in a daze. (Tr. 49). Plaintiff's husband stated that he has to remind Plaintiff to take her medication, remind her about conversations they had, and remind her of peoples' names. (Tr. 50).

4

In addition to her seizures, Plaintiff's husband testified that Plaintiff cannot get up once sitting. (Tr. 51). Plaintiff's husband has to help Plaintiff up from a chair and walk with her because her legs tend to give out. (*Id.*). Plaintiff's husband testified that Plaintiff's inability to stand up after sitting had been going on since Plaintiff's accident, four years prior to the hearing. (Tr. 52). When asked about the accident, Plaintiff's husband stated it occurred when Plaintiff was real sick and Plaintiff and her husband were going to go to the doctor but before they left Plaintiff went into the bathroom. (*Id.*). The next thing Plaintiff's husband heard was a "big 'ole bang" and the door flew open and Plaintiff was lying on the floor having a seizure. (*Id.*). Plaintiff's husband stated Plaintiff had been having small seizures prior to this accident but when she hit her head she had a Grand Mal seizure and it was then that Plaintiff was diagnosed with possible multiple sclerosis.

Vocational expert, Ron Gehrig, appeared before the ALJ at Plaintiff's October 2001 hearing. (Tr. 55). The ALJ directed Mr. Gehrig to assume an individual of Plaintiff's age, with twelve years of education, albeit special education, who is "not fully literate ... [but] can lift up to 20 pounds occasionally, 10 pounds frequently, ... sit for six to eight hours ... stand six hours out of an eight hour day, she can walk occasionally and then for short distances, she cannot climb, she cannot operate dangerous moving machinery, she cannot perform detailed or complex tasks, she cannot work with the public." (Tr. 56). Based on the hypothetical, Mr. Gehrig stated such a person could perform: as a food preparer (5, 384 jobs in Illinois), an assembler and light assembly (7, 999 jobs in Illinois), as a production assembler (13, 399 jobs in Illinois), or as a hand packager/packer (13, 003 jobs in Illinois). (*Id.*). When asked to modify the hypothetical to assume a person who can sit an unlimited amount but who could stand or walk for no more than five minutes, Mr. Gehrig initially responded that no jobs were available for a person with such limitations. (Tr. 57). However, after apparently

5

assuming the hypothetical only allowed for light work and not sedentary work, Mr. Gehrig changed

his answer to allow a person with such limitations to perform as an assembler under sedentary

conditions (8, 291 jobs in Illinois), as a production inspector (1, 797 jobs in Illinois), and as a

sedentary hand packer/packager (250 jobs in Illinois). (*Id.*). When asked by the ALJ to include a

further limitation that the hypothetical person could not maintain attention for a fifteen minute, Mr.

Gehrig replied "I don't think 15 minutes - - we're not talking any dangerous jobs here at all. I don't

believe that would have any." (Tr. 58). However, when asked to assume the hypothetical person

"spaces out" on a regular or continuing basis, Mr. Gehrig testified that no jobs exists for a person

with such limitations. (Tr. 58).

## III.  <u>MEDICAL HISTORY</u>

The earliest medical record available to the Magistrate Judge is dated October 14, 1999. (Tr.

189).    On this date, Plaintiff saw Dr. Youngsook Park, of Centegra Health System, for a

consultation. (*Id.*). Dr. Park reported that Plaintiff, in 1998, hit her head on a doorknob on the right

temporoparietal frontal area. (*Id.*). A CT scan of the head and EEG, taken at the time of her injury,[2]

were normal. (*Id.*). Dr. Park reported, after examining Plaintiff, Plaintiff had no evidence of

papilledema,[3] had brisk reflexes and no Babinski sign.[4] (*Id.*). Dr. Park noted evidence of ataxia and

---

[2] Again, as stated previously, the earliest report available to the Magistrate Judge is dated
October 1999.  The Magistrate Judge does not have any medical reports which reference
Plaintiff's 1998 head injury or any subsequent medical treatment prior to October 1999.

[3] Papilledema is edema of the optic disk, often due to increased intracranial pressure. *See*
STEDMAN'S MEDICAL DICTIONARY 1307 (27th ed. 2000).

[4] A Babinski sign is defined as an "extension of the great toe and abduction of the other
toes instead of the normal flexion reflex to plantar stimulation, considered indicative of
pyramidal tract involvement." *See* STEDMAN'S MEDICAL DICTIONARY 1635 (27th ed. 2000)

that Plaintiff most likely had a focal seizure involving the right side in the upper and lower extremities. (*Id.*). Dr. Park ultimately recommended a MRI of Plaintiff's head be taken and that Plaintiff should continue to take Dilantin[5] and keep the Dilantin level between 10 and 20. (*Id.*).

The following day, Plaintiff saw Dr. John Guido, a radiologist also with Centengra Health System. (Tr. 191). After Plaintiff had a scan of her brain done, Dr. Guido reported that bilateral various sized low T1, high T2, and FLAIR signal white matter lesions were present. (*Id.*). Some of the lesions were periventricular while others were deeper white matter with the largest lesion measuring 1 cm. (*Id.*). Dr. Guido also reported Plaintiff's cerebrum, cerebellum, and brain stem signal pattern were normal and that there was no extra axial collection or hemorrhage. (*Id.*). Additionally, there was no mass effect or enlargement of the ventricles with slight ventricular asymmetry and flow void in the basilar, and internal carotid arteries were compatible with vascular patency. (*Id.*). Dr. Guido's impressions noted Plaintiff had bilateral altered white matter signal involving periventricular and deep white matter, with some, but not all, lesions demonstrating enhancement. (*Id.*). Dr. Guido ultimately recommended further clinical evaluation and correction with neurologic examination findings. (*Id.*).

On October 17, 1999, Dr. Guido peformed a fluoroscopic lumbar puncture whereby he used a 22-guage spinal needle to abstract fluid from the thecal sac. (Tr. 193). On October 21, 1999, Plaintiff's results indicated that cerebrospinal fluid ("CSF") was positive for oligoclonal bands and that two oligoclonal CSF bands were observed. (Tr. 176).

On November 9, 1999, Dr. Park wrote a letter to Dr. Racquel Ramirez regarding Plaintiff.

---

[5]Dilantin is generally used for the control of grand mal and complex partial seizures and prevention and treatment of seizures occurring during or following neurosurgery. *See* PHYSICIANS' DESK REFERENCE 2531 (57th ed. 2003).

(Tr. 188). In the letter, Dr. Park indicated that a MRI of Plaintiff's head was performed on October 15, 1999, which revealed periventricular white matter and that, after undergoing a lumbar puncture, Plaintiff's spinal fluid revealed positive oligocional bands in CSF fluid. (*Id.*). However, Dr. Park noted that no bands were detected in the serum sample. (*Id.*). Although not documented in Plaintiff's medical record, Dr. Park wrote that after being discharged Plaintiff suffered another seizure on October 28, 1999. (*Id.*). Finally, Dr. Park wrote that Plaintiff was positive for Myelin basic proteins and as well as oligoclonal bands with an abnormal MRI. (*Id.*). Plaintiff's symptoms, according to what Dr. Park wrote, were consistent with multiple sclerosis. (*Id.*). On November 15, 1999, Dr. Park again wrote a letter on behalf of Plaintiff. This time Dr. Park wrote to Bill Muirhead of Social Security Income Disability. (Tr. 187). Dr. Park wrote "[Plaintiff] is unable to work due to: 1) Intractable seizure disorder; 2) Multiple sclerosis." (*Id.*).

The next medical report of any substance is dated June 21, 2000. (Tr. 201). On June 21, 2000, Terry Collins, RN,[6] wrote to Plaintiff regarding the results of Plaintiff's blood test. When or for what reasons Plaintiff had a blood test are unknown to the Magistrate Judge. All that is available is that nurse Collins wrote that the blood test revealed that Plaintiff's Dilantin level was very low and that it was very important for Plaintiff to continue her Dilantin therapy and see a physician immediately. (*Id.*).

On October 16, 2000, Plaintiff's husband filled out a Seizure Description Form whereby he was to answer the questions on the form based on his actual observations. (Tr. 185). Plaintiff's husband indicated that Plaintiff has seizures both during the day and at night and that she usually has

---

[6] Nurse Collins' letter does not indicate any affiliation with any hospital or medical practice.

8

more than one seizure per month. (*Id*.). Plaintiff's husband indicated on the form that the last seizure he had witnessed was four months prior although he also indicated that he had witnessed Plaintiff have numerous seizures. (*Id*.). Plaintiff's husband described Plaintiff's typical seizures as involving a loss of consciousness, jerking, thrashing movement, bitting of her tongue, and loss of bladder control. (*Id*.). Plaintiff's husband described Plaintiff's behavior immediately following her seizures as weak, in need of rest, and very frightened. (*Id*.).

Dr. Michael Bortoli, of the Riverside Medical Clinic, met with Plaintiff on October 20, 2000 to evaluate her claim of disability for the Illinois Department of Human Services. (Tr. 205). Dr. Bortoli reported that Plaintiff indicated that she cannot work because she gets numbness in her whole right side and she cannot stand. (*Id*.). Dr. Bortoli also indicated that Plaintiff is supposed to be taking Avonex but Plaintiff cannot afford the medication and therefore she is applying for disability. (*Id*.). Dr. Bortoli had a hard time ascertaining the frequency of Plaintiff's seizures and apparently found her not credible. For example, Dr. Bortoli wrote

> [Plaintiff] states that she had a seizure today before she came to this exam but describes that as a mild one with just tremoring. I asked her when her last previous seizure was and she said in June. Then she changed her mind and said that was the last serious seizure, that she has them all the time. Every week she has at least one seizure. Neither she nor her husband can explain what exactly these 'seizures' are like that she has all the time.

(*Id*.). Further, Dr. Bortoli found it hard to ascertain why Plaintiff was unable to work. (Tr. 206). Although Plaintiff stated her arms go numb, she gets fatigued easily, and she cannot walk for any distance, Dr. Bortoli found this not credible because Plaintiff "does not use any assistive devices." (*Id*.). Dr. Bortloli noted that upon examination, Plaintiff did not appear to be in any acute distress (Tr. 206) and that Plaintiff's extremities were grossly normal with full range of motion of all joints.

(Tr. 207). However, Dr. Bortoli did note that while Plaintiff exhibited a full range of motion of her back, there was pain noted on forward flexion at 80 degrees. (*Id.*). Plaintiff's neurolgical exam was normal and Plaintiff demonstrated no difficulty in use of manipulation with hands or fingers. (*Id.*). Plaintiff's gait was slightly ataxic with limping noted with the right leg and Plaintiff was unable to either toe or heel walk. (*Id.*). Dr. Bortoli's diagnosis indicated Plaintiff had a history of seizures, but the frequency of the seizure is impossible to determine, that Plaintiff was obese, and that Plaintiff suffered from possible multiple sclerosis. (Tr. 207). However, even with this diagnosis, Dr. Bortoli stated "I certainly cannot understand why [Plaintiff] could not do a sit down assembly job. She may have difficulty with ambulation into and out of the work environment." (*Id.*).

Dr. Gerald K. Hoffman, a psychiatrist, met with Plaintiff and wrote a report dated October 24, 2000 for the Disability Determination Services. (Tr. 210). Dr. Hoffman reported Plaintiff thinks she has multiple sclerosis because "she has the same symptoms as her mother ... ." (*Id.*). Those symptoms include the inability to stand longer then ten minutes, the inability to walk more then one half mile, seeing spots in front of her eyes, numbness in her right hand, tingling in her feet, and slurred speech. (*Id.*). Plaintiff's grip and ability to lift her purse, open and close doors, appeared to be without problem. Dr. Hoffman reported Plaintiff indicated to him that the Dilantin had stopped the seizures but that if Plaintiff "slacks off" on the medication she starts to have seizures. (*Id.*). As to Axis I, Dr. Hoffman's diagnostic impression was that Plaintiff may suffer from a Conversion Disorder whereby she mimics her mother's symptoms following being told that there is a "possibility" that she has multiple sclerosis. In terms of Axis III,[7] Dr. Hoffman's diagnostic impression was that Plaintiff has a seizure disorder secondary to a brain lesion of unknown origin

---

[7] Dr. Hoffman deferred Axis II.

thought to be a sign of multiple sclerosis at this time although doctors are noncommittal. (Tr. 211). Additionally, Plaintiff suffers from exogenous obesity and psoriatic arthritis. (*Id.*).

On December 28, 2000 and March 13, 2001, two doctors evaluated Plaintiff's psychiatric impairment(s). (Tr. 215, 230 respectively). The first report, unsigned, indicated that although Plaintiff did suffer a medical impairment(s), that impairment was not severe. (Tr. 215). The second report, signed but illegible, indicated Plaintiff suffered from no medically determinable impairments. (Tr. 230). Also on December 28, 2000, but dated January 2, 2001, Dr. E.C. Bone evaluated Plaintiff's residual functional capacity ("RFC"). Dr. Bone indicated that based on Plaintiff's medical records up to December 28, 2000, Plaintiff did not have any exertional limitations. (Tr. 245). In terms of postural limitations, Dr. Bone indicated Plaintiff can never climb a ladder/rope/scaffold but can frequently climb ramps/stairs and can frequently balance, stoop, kneel, crouch, and crawl. (Tr. 246). Dr. Bone found no manipulative, visual, or communicative limitations but did indicate, in terms of environmental limitations, Plaintiff should avoid exposure to hazards and machinery. (Tr. 248). Dr. William Conroy affirmed Dr. Bone's findings. (Tr. 244).

Lastly, on December 28, 2000, Judy Nesbett, unknown, reported that based on Plaintiff's RFC, which indicated no significant exertional, postural, or environmental restrictions, and Plaintiff's psychiatric review, which indicated a non-severe impairment, Plaintiff cannot be considered disabled. (Tr. 136). Ms. Nesbit further reported that examples of jobs which have demands within Plaintiff's capacity include: Box Bender (35, 380 jobs in Illinois); Breading Machine Tender (6, 742 jobs in Illinois); and Drier Attendant (14, 604 jobs in Illinois). (*Id.*).

11

## IV.   STANDARD OF REVIEW

The court may affirm, modify, or reverse the ALJ's decision outright, or remand the proceeding for rehearing or hearing of additional evidence. 42 U.S.C. § 405(g). Review by the court, however is not *de novo*; the court "may not decide the facts anew, reweigh the evidence or substitute its own judgment for that of the ALJ." *Meredith v. Bowen*, 833 F.2d 650, 653 (7th Cir. 1987) (citation omitted); *see also Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986). The duties to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide the case accordingly are entrusted to the commissioner; "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Commissioner (or the Commissioner's delegate the ALJ)." *Richardson v. Perales*, 402 U.S. 389, 399-400 (1971), *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987). If the Commissioner's decision is supported by substantial evidence, it is conclusive and this court must affirm. 42 U.S.C. § 405(g); *see also Arbogast v. Bowen*, 860 F.2d 1400, 1403 (7th Cir. 1988). "Substantial evidence" is "such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401.

The Seventh Circuit demands even greater deference to the ALJ's evidentiary determinations. So long as the ALJ "minimally articulate[s] his reasons for crediting or rejecting evidence of disability," the determination must stand on review. *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992). Minimal articulation means that an ALJ must provide an opinion that enables a reviewing court to trace the path of his reasoning. *Walker v. Bowen*, 834 F.2d 635, 643 (7th Cir. 1987), *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985). Where a witness credibility determination is based upon the ALJ's subjective observation of the witness, the determination may

only be disturbed if it is "patently wrong" or if it finds no support in the record. *Kelley v. Sullivan*, 890 F.2d 961, 965 (7th Cir. 1989), *Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir. 1989). "However, when such determinations rest on objective factors of fundamental implausibilities rather than subjective considerations, [reviewing] courts have greater freedom to review the ALJ decision." *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994), *Yousif v. Chater*, 901 F. Supp. 1377, 1384 (N.D. Ill. 1995).

## V.   **FRAMEWORK FOR DECISION**

The ALJ concluded that Plaintiff did not meet the Act's definition of "disabled," and accordingly denied her application for benefits. "Disabled" is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382(c)(3)(A). A physical or mental impairment is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382(c)(3)(C). *See Clark v. Sullivan*, 891 F.2d 175, 177 (7th Cir. 1988).

The Commissioner proceeds through as many as five steps in determining whether a claimant is disabled. 20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f) (1998).[8] The Commissioner sequentially determines the following: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment

---

[8]The Commissioner has promulgated parallel regulations governing disability determinations under Title II and Title XVI. See 20 C.F.R. Ch. III, Parts 404, 416. For syntactic simplicity, future references to Part 416 of the regulations will be omitted where they are identical to Part 404.

meets or is medically equivalent to an impairment in the Commissioner's Listing of Impairments;

(4) whether the claimant is capable of performing work which the claimant performed in the past;

and (5) whether the claimant is capable of performing any other work in the national economy.

At Step One, the Commissioner determines whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520 (a),(b). Substantial gainful activity is work that involves doing significant and productive physical or mental duties that are done, or intended to be done, for pay or profit. 20 C.F.R. § 404.1510. If the claimant is engaged in substantial gainful activity, he is found not disabled, regardless of medical condition, age, education, or work experience, and the inquiry ends; if not, the inquiry proceeds to Step Two.

Step Two requires a determination whether the claimant is suffering from a severe impairment.[9] A severe impairment is one which significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). The claimant's age, education, and work experience are not considered in making a Step Two severity determination. 20 C.F.R. § 404.1520(c). If the claimant suffers from severe impairment, then the inquiry moves on to Step Three; if not, then the claimant is found to be not disabled, and the inquiry ends.

At Step Three, the claimant's impairment is compared to those listed in 20 C.F.R. Ch. III, Part 404, Subpart P, Appendix 1. The listings describe, for each of the major body systems, impairments which are considered severe enough *per se* to prevent a person from doing any significant gainful activity. 20 C.F.R. §§ 404.1525(a). The listings streamline the decision process

---

[9]The claimant need not specify a single disabling impairment, as the Commissioner will consider the combined affect of multiple impairments. See, e.g., 20 C.F.R. § 404.1520(c). For syntactic simplicity, however, this generic discussion of the Commissioner's decision-making process will use the singular "impairment" to include both singular and multiple impairments.

by identifying certain disabled claimants without need to continue the inquiry. *Bowen v. New York*, 476 U.S. 467 (1986). Accordingly, if the claimant's impairment meets or is medically equivalent to one in the listings, then the claimant is found to be disabled, and the inquiry ends; if not, the inquiry moves on to Step Four.

At Step Four, the Commissioner determines whether the claimant's residual functional capacity allows the claimant to return to past relevant work. Residual functional capacity is a measure of the abilities which the claimant retains despite his impairment. 20 C.F.R. § 404.1545(a). Although medical opinions bear strongly upon the determination of residual functional capacity, they are not conclusive; the determination is left to the Commissioner, who must resolve any discrepancies in the evidence and base a decision upon the record as a whole. 20 C.F.R. § 404.1527(e)(2); *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995). Past relevant work is work previously performed by the claimant that constituted substantial gainful activity and satisfied certain durational and recency requirements. 20 C.F.R. § 404.1565; Social Security Ruling 82-62. If the claimant's residual functional capacity allows him to return to past relevant work, then he is found not disabled; if he is not so able, the inquiry proceeds to Step Five.

At Step Five, the Commissioner must establish that the claimant's residual functional capacity allows the claimant to engage in work found in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(f), 404.1566. The Commissioner may carry this burden by relying upon vocational expert testimony, or by showing that a claimant's residual functional capacity, age, education, and work experience coincide exactly with a rule in the Medical-Vocational Guidelines (the "grids"). *See* 20 C.F.R. Ch. III, Part 404 Subpart P, Appendix 2; *Walker v. Bowen*, 834 F.2d 635, 640 ( 7th Cir. 1987); Social Security Law and Practice, Volume 3, § 43:1. If the ALJ correctly

relies on the grids, vocational expert evidence is unnecessary. *Luna v. Shalala,* 22 F.3d 687, 691-92 (7th Cir. 1994). If the Commissioner establishes that sufficient work exists in the national economy that the claimant is qualified and able to perform, then the claimant will be found not disabled; if not, the claimant will be found to be disabled.

## VI.    ANALYSIS

The court will proceed through the five step analysis in order.

A. Step One: Is the claimant currently engaged in substantial gainful activity?

In performing the Step One Analysis the ALJ found that Plaintiff had not engaged in any substantial gainful activity at any time relevant to his decision issued on January 25, 2002. (Tr. 17).

Under ordinary circumstances, a claimant is engaged in substantial gainful activity if the claimant's earnings averaged more than seven hundred and eighty dollars per month for years after January 1, 2001. (20 C.F.R. § 1574 (b) (2) Table 1, as modified by 65 FR 82905, December 29, 2000).

The finding of the ALJ as to Step One of the Analysis is not challenged by either party and the court finds no reason to disturb this finding. The ALJ's determination as to Step One of the Analysis is affirmed.

B. Step Two: Does the claimant suffer from a severe impairment?

In performing the Step Two Analysis the ALJ found Plaintiff suffered from severe impairments. Specifically, the ALJ found the Plaintiff suffers from a history of seizure disordera and possible multiple sclerosis, which has resulted in her ability to perform basic work activities. (Tr. 15).

Substantial evidence exists to support the ALJ's determination that Plaintiff suffers from

16

severe impairments. This finding is not challenged by either party and the court finds no reason to disturb it. The ALJ's finding as to Step Two of the Analysis is affirmed.

C.     Step Three:  Does claimant's impairment meet or medically equal an impairment in the Commissioner's listing of impairments?

In performing the analysis for Step Three the ALJ determined that Plaintiff's impairments do not meet or equal any impairment in Appendix 1 to Subpart P of Regulations number 4. (Tr. 15). The ALJ found, in one sentence:

> [w]hile the medical evidence indicates that the claimant does have impairments that are severe within the meaning of the Regulations, they are not singly or in combination severe enough to meet or equal one of the limitations listed in Appendix 1, Subpart P, Regulations No. 4 (Social Security Ruling 96-6p.)

(*Id*.). The Magistrate Judge has some deep concerns about the ALJ's evaluation (or lack thereof) of Plaintiff's disorders.  The Magistrate Judge believes the severity of Plaintiff's impairments related to her seizures and possible multiple sclerosis deserves more than a mere conclusory sentence, especially because, when fully evaluated, the Plaintiff's impairments may meet or medical equal in severity the criteria of a listed impairment in Appendix 1.  In order to properly determine that Plaintiff does not satisfy the requirements of Listing 11.00, which the ALJ did not mention once in his opinion, the ALJ must proceed through the listing and the cross references to other listings.

Section 11.00(A) provides:

> *Convulsive disorders.* In convulsive disorders, regardless of etiology degree of impairment will be determined according to type, frequency, duration, and sequelae of seizures.  At least one detailed description of a typical seizure is required.  Such description includes the presence or absence of aura, tongue bites, sphincter control, injuries associated with the attack, and postical phenomena.  The reporting physician should indicated the extent to which description of seizures reflects

17

his own observations and the source of ancillary information. Testimony of persons other than the claimant is essential for description of type and frequency of seizures if professional observation is not available.

In addition to Section 11.00(A), and because Plaintiff possibly suffers from multiple sclerosis, Section 11.00(E) must be analyzed. Section 11.00(E) provides:

*Multiple sclerosis*. The major criteria for evaluating impairment caused by multiple sclerosis are discussed in listing 11.09. Paragraph A provides criteria for evaluating disorganization of motor function and gives reference to 11.04B (11.04B then refers to 11.00C). Paragraph B provides references to other listings for evaluating visual or mental impairments caused by multiple sclerosis. Paragraph C provides criteria for evaluating the impairments of individuals who do not have muscle weakness or other significant disorganization of motor function at rest, but who do develop muscle weakness on activity as a result of fatigue.

Section 11.09 provides *Multiple Sclerosis*, With:

A. Disorganization of motor function as described in 11.04B; or

B. Visual or mental impairment as described under criteria in 2.02, 2.03, 2.04 or 12.02; or

C. Significant reproducible fatigue of motor function with substantial muscle weakness on repetitive activity, demonstrated on physical examination, resulting from neurological dysfunction in areas of the central nervous system known to be pathologically involved by the multiple sclerosis process.

In order to properly analyze section 11.09A, 11.04B must be analyzed. 11.04B (*Central Nervous System Vascular*) provides:

B. Significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movements, or gait and station.

18

In order to properly analyze section 11.09B, 2.02, 2.03, and 2.04 must be analyzed.[10] These sections provide:

> 2.02 *Impairment of central visual acuity.* Remaining vision in the better eye after best correction is 20/200 or less.
>
> 2.03 *Contraction of peripheral visual fields in the better eye.*
>
> > A. To 10 degrees or less from the point of fixation; or
> >
> > B. So the widest diameter subtends an angle no greater than 20 degrees; or
> >
> > C. To 20 percent or less visual field efficiency.
>
> 2.04 *Loss of visual efficiency.* Visual efficiency of better eye after best correction 20 percent or less. (The percent of remaining visual efficiency=the product of the percent of remaining central visual efficiency and the percent of remaining visual field efficiency.)

Any analysis should begin with Listing 11.00(A) and (E). Although Plaintiff's medical records plainly document her history of seizures and the possibility of having multiple sclerosis, the ALJ altogether failed to discuss, or even cite, Listing 11.00. Depending on the circuit, this omission alone would dictate remand. *Compare Burnett v. Commissioner*, 220 F.3d 112, 119-20 (3d Cir. 2000)(remanding where the ALJ "'merely stated a summary conclusion that appellant's impairments did not meet or equal any Listed Impairments,' without identifying the relevant listed impairments, discussing the evidence, or explaining his reasoning.")(*citing Clifton v. Chater*, 79 F.3d 1007, 1009)(10th Cir. 1996)), *with Senne v. Apfel*, 198 F.3d 1065, 1067 (8th Cir. 1999)(holding that a the conclusory form of the ALJ's decision alone does not justify remand).

---

[10] Section 12.02 deals with Organic Mental Disorders such as psychological or behavioral abnormalities associated with a dysfunction of the brain. Because Plaintiff does not appear to suffer from such disorders 12.02 will not be discussed.

However, the Seventh Circuit has not directly ruled whether failing to discuss or even cite a Listing at step three justifies remand. *See Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)(stating the Seventh Circuit need not address the tension between the circuits as to whether a conclusory statement at Step Three is fatal because the ALJ's decision could not stand even if she cited the correct rule). But the Magistrate Judge is hard pressed to proceed without a complete analysis at Step Three. Principles of administrative law require the ALJ to rationally articulate the grounds for her decisions thereby building "an accurate and logical bridge from the evidence to her conclusion." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). This then allows the Magistrate Judge to confine his review to the reasons supplied by the ALJ. *See Johnson v. Apfel*, 189 F.3d 561, 564 (7th Cir. 1999); *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996). This has not been done and the Magistrate Judge cannot proceed.

Before the ALJ can proceed onto Step Four and Five of the disability determination, the ALJ must at the very least discuss Listing 11.00 since it applies to Plaintiff's history of seizures and possibility of multiple sclerosis. The Magistrate Judge is not suggesting that once evaluated the ALJ should determine that Plaintiff satisfies either Listing 11.00(A) or (E), but only that some elaboration is necessary. The ALJ should discuss the evidence at least to the extent to show the court the path used by the ALJ and the evidence accepted and the evidence rejected.

Lastly, without getting into greater elaboration, the Magistrate Judge recommends the ALJ resubmit a hypothetical to the vocational expert including some limitation regarding Plaintiff's seizures. This limitation should not only include the fact that Plaintiff "cannot maintain attention for a 15 minute period" but should also include physical symptoms associated with Plaintiff's "episodes" and how those might affect her ability to perform jobs such as a food preparer, an

assembler, a production inspector, or a hand packager/ packer. Hypothetical questions posed to vocational experts ordinarily must include *all* limitations supported by medical evidence in the record. *Steele*, 290 F.3d at 942; *Cass v. Shalala*, 8 F.3d 552, 555-56 (7th Cir. 1993). The obvious reason for this is so the vocational expert does not refer to jobs that the Plaintiff cannot perform because the vocational expert did not know the full range of Plaintiff's limitations. Additionally, the ALJ should reevaluate Plaintiff to determine if her seizures are still present or whether they have subsided and to update Plaintiff's medical record with any recent physician reports.

## VII.    CONCLUSION

For the above stated reasons, Plaintiff's Motion for Summary Judgment is granted. The case is remanded for determination of Plaintiff's seizure disorder and possible multiple sclerosis under Listing 11.00. It is further ordered that Defendant's Motion for Summary Judgment is denied.

**ENTER:**

P. MICHAEL MAHONEY, MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

DATE: 4/10/03

21

# United States District Court
## Northern District of Illinois
### Western Division

SHANNON C. ALLEN

v.

JOANNE BARNHART

**JUDGMENT IN A CIVIL CASE**

Case Number: 02 C 50099

☐      Jury Verdict. This action came before the Court for a trial by jury. The issues have been tried and the jury rendered its verdict.

☑      Decision by Court. This action came to hearing before the Court. The issues have been heard and a decision has been rendered.

IT IS HEREBY ORDERED AND ADJUDGED that Plaintiff's motion for summary judgment is granted. Defendant's motion for summary judgment is denied. This case is remanded to the ALJ.

Michael W. Dobbins, Clerk of Court

Date: 4/10/2003

Gale L. Graeff, Deputy Clerk